**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| PAULEEN MATHIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:20-cv-108 |
| | ) | |
| DOLGENCORP, LLC d/b/a DOLLAR | ) | |
| GENERAL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Defendant Dolgencorp, LLC d/b/a Dollar General Corporation (Dollar General) terminated Plaintiff, Pauleen Mathias (Mathias), for allegedly violating its safety policies. Mathias, however, believes discrimination was at play. She filed suit claiming Dollar General interfered with her rights under the Family Medical Leave Act (FMLA), discriminated against her and failed to reasonably accommodate her under the Americans with Disabilities Act (ADA), subjected her to a hostile work environment, and terminated her in retaliation for taking FMLA leave and requesting an accommodation.

Before the Court is Dollar General's Motion for Summary Judgment. (ECF No. 38) and its Motion to Strike the Declaration of Don Mathias (ECF No. 46). The parties have fully briefed the motions, (ECF Nos. 39, 40, 43-48), making them ripe for consideration. Because the Court finds genuine issues of material fact preclude judgment as a matter of law on Plaintiff's FMLA retaliation claim, summary judgment will be DENIED as to that claim.

**FACTUAL BACKGROUND**

*a.  The Parties*

Dollar General is a discount retailer of basic consumer goods, including household items, cleaning supplies, and food. (ECF No. 40-3, Decl. of Linda Daugherty, ¶ 3)[1]. Dollar General's retail stores are supplied, in large part, by Dollar General's distribution centers, including the Marion Distribution Center (the Marion DC). (*Id*.). This building is compartmentalized into three major areas: Receiving, Shipping, and Cycling. In the Receiving (or inbound) area, employees unload merchandise delivered to the Marion DC by various suppliers via semi-truck trailers, and the merchandise is stored and then allocated (through the shipping area) to retail stores based on each store's inventory needs. (*Id*. ¶ 5).

In the Shipping (or outbound) area, employees known as "pickers" retrieve products from shelves and place them onto rolltainers, which are large, screened, metal carts in which merchandise is stacked (Daugherty Decl. ¶ 6). The rolltainers are then loaded onto semi-truck trailers in the shipping docks for outbound delivery to Dollar General's retail stores. (*Id*.). Lastly, once the merchandise is delivered from the Marion DC to the retail stores, the empty semi-truck trailers are transported back to the Marion DC, where employees in the Cycling area unload the empty rolltainers, totes, and cardboard and put them back into circulation for use at the Marion DC. (*Id*. ¶ 7).

In November 2017, Mathias applied for work with Dollar General in the sanitation department. (Pauleen Mathias Dep., ECF Nos. 40-1 and 44-3, at 49-50). Despite applying for a position in the sanitation department, Mathias was hired by Dollar General as a General Warehouse Worker. (Daugherty Decl. ¶ 8). General Warehouse Workers are responsible for all handling of merchandise into and out of the Marion DC location but are specifically assigned to an area of the warehouse. (*Id*. ¶ 9). During her orientation, Mathias learned she was assigned to the Repack

---

[1] During Mathias' employment, Linda Daugherty (Daugherty), served as Senior Human Resources Manager at Dollar General's Marion DC. (Daugherty Decl. ¶ 2).

Department. (Mathias Dep. at 53-54). In this department, full cases of merchandise are broken into single items or packs, allowing Repack "pickers" to then fill inventory orders by placing the ordered merchandise into containers called totes, to then be placed for outbound delivery. (Daugherty Decl. ¶ 10; Mathias Dep. at 51).

Employees in the Repack department routinely work at least 40 hours per week consisting of four 10-12-hour shifts. (Mathias Dep. at 54). Depending on order or production volume, mandatory overtime shifts may be required which could include four days of 12-hour shifts with an addition of a fifth day.

### b.  *Third-Party Administrator, Matrix*

Dollar General uses Matrix Absence Management, Inc. (Matrix) as a third-party administrator for managing its employees' leaves of absence, including leave taken under the FMLA, requests for accommodations under the ADA, and employee disability benefits. (Jessica Defield Decl., ECF No. 40-4, ¶¶ 2-3; Daughtery Dep. at 28-30). Employee medical information, work restrictions, requests for accommodations and FMLA leave are submitted to Matrix for review.[2] Matrix, in turn, evaluates all the information, decides on leave requests or work restrictions, and notifies human resources and management as to the length of leave, or when the employee is released to work without restrictions. (Daugherty Dep. at 53-56). According to Daugherty, she lacked the authority to make leave or accommodation determinations.

### c.  *Mathias' Ankle Impairment and her Requested Accommodations*

---

[2] Matrix manages all time off that doesn't fall within the attendance policy. (Daugherty Decl. at 55).

When she applied for employment with Dollar General, Mathias had a pre-existing right ankle injury from a motor vehicle accident in July 1996. (Mathias Dep. 22).[3]  Mathias experiences arthritic symptoms in her right ankle and has persistent pain in her right ankle. (*Id.*; ECF No. 44-2). This pain comes with stiffness, swelling and, weakness, aggravated by daily activities such as work activities, walking, standing, and descending stairs. (*Id.*). Mathias disclosed this injury during her pre-employment medical examination and in her interview with Dollar General. Mathias testified that during her interview she told her interviewer about her ankle injury but was assured that work in the sanitation area would not be strenuous:

> I had let her know that I had a preexisting injury, that it acts up now and again, nothing major, and that's when she told me that it was only four ten-hour days with an occasional half day on Friday, and it would be nothing too strenuous since I was doing the sanitation which was changing the trash, sweeping the floors, stuff like that.

(*Id.* at 53). Mathias did not request any accommodation from Dollar General at the time of her interview.

Consistent with her statements in the interview, Mathias did not have significant problems with her ankle before her new job began at Dollar General. And in the early months of her employment with Dollar General, Mathias achieved a "Top Dawg" rating for being a top performer. In fact, Daugherty described Mathias as a "strong performer." (Mathias Dep. 97-99, 173-174; Daugherty Dep., ECF No. 40-2, 44-6, at 26). By fall 2018, however, Mathias began experiencing chronic ankle pain and visited her doctor. (ECF No. 44-1, Mathias Dep. at 98, 99).

At her September 7, 2018, appointment with Dr. W.M. Roper, (Dr. Roper), he diagnosed Mathias with post-traumatic osteoarthritis, noting that her symptoms were aggravated by standing,

---

[3]Mathias fractured her right ankle in that accident and was treated with an open reduction and internal fixation. X-rays of her ankle show "severe degenerative joint disease of the right ankle joint with bone on bone and flattening of the joint." (ECF No. 44-1 at 2)

walking, weather changes, and work activities. (ECF No. 44-1, at 1). Dr. Roper suggested that Mathias might obtain relief by wearing a specialized orthotic boot or some other type of work boot. After this appointment, Dr. Roper provided Mathias a return-to-work note permitting her to return to Dollar General without restrictions. (Mathias Dep. at 119 and Ex. 11).

At some point, possibly September 10 or 11, Mathias spoke with Daughtery about Dr. Roper's suggestion that she wear a specialized medical boot to provide relief to her ankle. (Mathias Dep. at 102, 103; Daughtery Dep. at 26). The medical boot was a standard walking boot with an open-toe. Mathias contends that she showed Daugherty the boot and Daughtery told her she could not wear it because it would be considered a "crutch" which was not allowed in the warehouse for safety reasons. Daughtery recalls the conversation differently and states she told Mathias that any boot she wore had to be closed-toe to not violate Dollar General's safety protocol prohibiting open-toe footwear or using crutches while on the warehouse floor. (Daughtery Dep. at 27). Either way, Mathias interpreted the conversation to mean she could not wear the specialized boot.[4]

On September 20, 2018, Dr. Roper provided medical certification to Matrix to receive an accommodation under the ADA for Mathias to wear a boot on the warehouse floor:

> Please excuse Pauleen for we have placed her in a fixed ankle walker boot in hopes that this will make her ankle better and as well feel better. If she can not wear this boot to work then please allow her to wear a 6-8 inch work boot to help support her ankle.

(ECF No. 40-1, Mathias Dep. Ex. 12). After receiving this medical certification, Mathias could wear a "6-8-inch work boot" because it was closed-toe. (Mathias Dep. at 120-121).

### d. FMLA Requests

---

[4] Mathias also contends she saw another general warehouse worker with crutches and a walking boot. (Mathias Dep. at 113-114). No specific details about this allegation are provided.

In October 2018, Mathias saw an orthopedic specialist, Dr. Steven Herbst (Dr. Herbst), who proposed that Mathias either have surgery or wear a customized insert/brace for her work boots that would stabilize and immobilize her ankle. (ECF No. 44 at 12). Mathias chose the brace so she would not miss work for eight to twelve weeks to recover from surgery. Dr. Herbst also advised Mathias about the possibility of taking FMLA leave to reduce her workload.

In early December 2018, Mathias again spoke with Dr. Herbst who encouraged her to request FMLA leave to reduce her schedule. Mathias submitted to Matrix an FMLA medical certification from her doctor with a work restriction of "max 40 hours per week" with 8-hour days because of "post-traumatic arthritis of right ankle that requires custom bracing." (ECF No. 44-4 at 5). Two days later, Matrix approved Mathias' request for December 3, 2018, through January 25, 2019, and communicated this approval to Daughtery by email. (ECF No. 44-5). Daughtery responded to Matrix' email: "This is approved for 'reduced schedule.' We do not make accommodations for reduced schedules. Please advise."[5] (*Id.*). After a series of email correspondence between Dollar General's Leave Administration Department and Daugherty clarified that the reduced schedule was approved by Matrix as FMLA intermittent leave, Matrix advised Daugherty that Mathias should be scheduled to work five days per week, 40 hours per week." (*Id.*).

While these discussions were ongoing, Mathias continued to work her regularly scheduled 10-hour shifts on December 9 and December 10 – days that she had been approved by Matrix for FMLA leave. On December 11, Mathias describes being "suspended" from work until Daugherty

---

[5]Although there is some confusion over the boxes checked by Dr. Herbst on the FMLA medical certification form and the implication of those boxes on Mathias' request for leave, the Court finds the dispute immaterial to the issues presented. Regardless of which boxes were checked, the employer was on notice that FMLA leave for a serious health condition, was being requested.

received clarification from Matrix on implementing the reduced schedule. Daugherty, however, objects to the term "suspended" and says that Mathias was sent home to ensure that Dollar General wasn't violating her reduced schedule request. Regardless of which version is true, Mathias was off work from December 11 through December 13. Daugherty advised Mathias she would receive backpay for any compensable time she missed. Mathias returned to work the next week on the reduced schedule and received full backpay as promised, including pay for the day she was sent home. (Mathias Dep. 137-139). All told, Mathias worked four hours (2 hours each day on December 9 and 10) when she should have been on FMLA leave.[6]

### e.  *Write-Ups, Coworker Harassment and Dollar General's Investigation*

When Mathias returned to work, she states she received three "write ups" for violations in November. (Mathias Dep. at 158-160). The nature of the write-ups is not apparent in the record but it appears the dates of at least two of the violations, November 24 and November 28, 2018, occurred before Mathias' request for FMLA leave. Dollar General concedes that Mathias received multiple write-ups after returning to work, but Daugherty explained that the write-ups were saved to do at one time because both Mathias and her supervisor were gone on vacation. (Daugherty Dep. at 85: "So when everybody was back at work, that's when her supervisor got with her about the write-ups and discipline and then issued those."). Thus, Daugherty explains that the write-ups were unrelated to Mathias' request for leave

Mathias also contends that her coworkers in the Repack Department began subjecting her to harassment when they learned of her reduced schedule. Mathias believes that her coworkers were angry that she was allowed to work a reduced schedule and accused her of faking her ankle injury. (Mathias Dep. at 139-145). One coworker, Jerry Leavitt (Leavitt), asked Mathias, "What

---

[6]On January 16, 2019, Dr. Herbst advised Matrix that her restrictions needed to be extended because Mathias had not received her custom brace. (ECF No. 40-4 at 12).

d—k [did you] have to suck to get off at 12:30?" She states that Leavitt and another coworker called her "gimp" and "crip" a few times on different days. (*Id.* at 163-166). Mathias described the Repack Department as a "henhouse" and "if you are not part of the clique or part of their team, you get picked on, you get bullied, you get harassed." (*Id.* at 168). She claims that employees have quit or moved to different departments because of the "Repack clique." (*Id.*).

Fed up, Mathias authored a letter to Daugherty recounting her request to wear a walking boot, her request for a reduced schedule, the above harassment from her coworkers and her receipt of three write-ups just after being granted the reduced schedule. (ECF No. 44-7). Mathias further wrote, "I am hoping that this company is not 'fishing' for a way to eliminate me from employment." (*Id.).* Mathias concluded her letter by requesting a transfer from Repack to "a more suitable position."[7]

After receiving Mathias' letter, Daugherty began investigating her allegations of coworker harassment. Daugherty interviewed eight hourly employees and four supervisors and managers in the Repack Department. (Daugherty Dep. at 89-95). None of these individuals reported witnessing any of the harassing, offensive, or inappropriate remarks that were allegedly made to Mathias. With no corroborating information, Daugherty took no disciplinary action against anyone.

During her investigation, however, it became clear to Daugherty that others in the Repack department were salty about Mathias' reduced schedule. Daugherty received comments from

---

[7] Mathias wrote:

> I am willing to obtain the correct pay for the position of transfer. I prefer to transfer to sanitation, cycling, or off lines. I am asking to stay on the weekend shift and to be far away from repack completely. I do not care anymore about the hourly pay rate. I do not care about the missed overtime. I do not care if I have to come in at 4am, 5am or 6 am. I do not care if I work 8 hours a day or 10 hours a day. Just right now no more than 40 hours a week and no more than five days a week…

Mathias' coworkers inquiring why Mathias could work reduced hours. (Daugherty Dep. at 98-100). Daugherty interpreted these comments to mean that Mathias' coworkers were "resentful" of her reduced schedule. (*Id.* at 100).

After concluding the investigation into the alleged harassment, Dollar General offered to transfer Mathias to two other positions – a nonconveyables position and a shipping position -- to attempt to remove her from the situation she was facing in the Repack Department. (Daugherty Dep. at 90).[8] Mathias did not take either position.

### f. *Extension of FMLA Leave*

On March 15, 2019, Mathias provided Matrix with an updated medical certification that permitted her to work up to 50 hours a week. (ECF No. 40-1, Mathias Dep. at 278, 279). Since Dollar General was averaging 50 hours a week or less at the time, Matrix concluded that Mathias no longer required a reduced schedule. (ECF No. 44-13). Matrix did leave open the possibility that a reduced schedule would be implemented if the workload exceeded 50 hours a week. (*Id.*).

On April 4, 2019, Dr. Herbst submitted more documentation to Matrix requesting intermittent leave for Mathias for the period of April 4, 2019, through May 4, 2019. (ECF No. 40-4 at 26). Dr. Herbst indicated that Mathias had received the custom bracing but needed adjustment time. He further indicated, "patient is able to work regular hours with intermittent leave for pain and possible appointments 15 hours per week for 1 month." (*Id.*). Matrix certified Mathias' leave through April 21 but did so only after Mathias' employment had already been terminated.

---

[8]Mathias asserts that her letter was not the first time she sought a transfer. She contends that her prior requests to be transferred to a position that would better accommodate her were denied. She contends her transfer requests were denied because she was a "Top Dawg" or high-ranking performer, who received systematic write-ups preventing transfer for four weeks after each. (Mathias Dep. at 173-175). Mathias believes that her supervisors wished to keep her in this department due to her high-achieving performance.

The records from March 15, 2019, up until the point Mathias was terminated confirm that she did not exceed 50 hours of work restriction for any week. (ECF No. 40-3).

**g.  *FMLA Leave Tracking***

During the time Mathias was on FMLA leave, Matrix tracked the FMLA leave being used by an employee. (Daugherty Dep. at 69-70). Mathias was instructed to call in to Matrix each day that she would have been scheduled for overtime to report the hours that were missed due to overtime hours. (*Id.*). According to Mathias, Daugherty would report that Mathias had missed four hours each day of work without regard to how many hours Mathias was missing. Mathias would contact her coworkers to determine what their end time was each day so that she could report the time to Matrix, but she contends that Daugherty disputed her reports to Matrix. (Mathias Dep. at 223-224). Mathias believes that Daugherty's conduct caused her to use more FMLA time each day than necessary causing her to accumulate FMLA leave hours more quickly than she otherwise would. (ECF No. 44-12). That said, at no time during her employment did Mathias run short on FMLA leave time.

**h.  *Events Leading to Plaintiff's Termination***

In early April, Daugherty received an email spreadsheet cataloguing employee call-offs. (ECF No. 44-14). She responded to the email by stating: "see where this puts Pauleen Mathias. If it is a term[ination], please forward me term paperwork." (*Id.*). The email chain initially identified Mathias was at the 2nd written warning stage with 4.5 attendance points; but, it also appeared that at some point, her attendance points were changed to PTO time which did not accumulate attendance points.

On April 16, 2019, Mathias overheard a conversation between Daugherty, Huntington, and Myers. Mathias heard Daugherty say, "yes, she filed for FMLA again; don't worry, we'll get rid

10

of her before it's approved." (Mathias Dep. at 218-219). Given Dr. Herbst's recent recertification sent to Matrix on April 4, Mathias believed this conversation was about her.

The next day, one of Mathias' supervisors, John Kuhn, emailed Daugherty, Katie Abbott (Abbott), Morgan Myers (Myers), and Phil Huntington (Huntington)[9]: "Kayla came and told us that Paula is climbing on the racks to get product that isn't coming down. I'm going to mention this in the morning meeting tomorrow but didn't know if you wanted to leave it at that or go further." (ECF No. 44-15). Daugherty responded to the email:

> A supervisor see it? I need a statement from Kayla in case we need it and leadership needs to keep an eye on her if you see it contact Katie immediately and move forward. This has been mentioned previously right when Barb was let go?

(*Id.*). That same day, Abbott suspended Mathias pending an investigation. (ECF No. 44-16). Mathias made a written statement writing "I am short and I went up the rack to get product." (ECF No. 44-8). Mathias was then terminated on April 22, 2019, for admitting to climbing on the racks. (ECF No. 44-17). Despite her written statement, Mathias now contends she only stepped on a four inch ledge at the bottom of the rack. (Mathias Dep. at 210-211).

Daughtery testified that climbing the racks was a "10 out of 10" in severity. Because it was a safety concern, progressive discipline could be skipped and an employee could be immediately terminated. Ultimately, Daughtery and John Bartlett (Bartlett), the Marion DC Director, made the decision to terminate Mathias.

### i. *Other Potential Similarly Situated Individuals*[10]

---

[9] Abbott, Meyer, Huntington, Kuhn, and Kaitlyn Sams (Sams) were all warehouse supervisors during these events.

[10] Mathias' husband, Donald Mathias (Donald), who is also employed by Dollar General, submitted an affidavit in which he recounts a conversation he had with his supervisor following his wife's termination. From that conversation, Donald tries to identify a comparator who was not terminated after standing beside a conveyor with his foot on live rollers. Donald's affidavit also identifies a second individual who injured himself climbing down from a conveyor belt. Donald contends that he continued to see this individual at

In March 2019, two employees at the DC Warehouse were seen climbing racks and received discipline. Barb Quick (Quick), who was also a repack employee, was seen standing up on top of the rollers on top of racking. (ECF No 44-19, Interrog. Resp. #8). Both of Quick's feet were on the rollers and she was hanging on the moving cardboard conveyor belts while totes were traveling down the conveyor. After an investigation, Quick was terminated by Daughtery, Bartlett and Assistant Director, Michael Henderson.

Ashley Ferdin was also seen climbing on racking to pull product forward instead of using a pole to reach the product. (Interrog. Resp. #8). Ferdin's supervisor, Jen Moreland, discussed the issue with her and issued her a S.M.A.R.T. coaching document.[11] The incident was also noted in her employee file. She was not terminated because of this incident.

## APPLICABLE STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts

---

work after the incident. Dollar General has moved to strike this affidavit on multiple grounds. (ECF No. 46). The Court agrees that there are problems with this evidence but because the Court has not considered any of the facts from the affidavit in resolving the present motion for summary judgment, the Motion to Strike (ECF No. 46) is DENIED as MOOT.

[11] S.M.A.R.T. stands for "Specific Measurable Assignable Relevant & Time-Based." S.M.A.R.T. Coaching is part of Dollar General's progressive discipline policy and is designed to provide employees with constructive feedback and realistic goals to improve their performance. (ECF No. 40-3, ¶11).

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## DISCUSSION

Based on the above facts, Mathias makes a myriad of claims against Dollar General, including claims under the ADA for disparate treatment, failure to accommodate, retaliation and a hostile work environment; and claims under the FMLA for interference and retaliation. Dollar General seeks summary judgment on all claims. The Court addresses each of these in turn.

### A. ADA Claims

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of his disability." 42 U.S.C. § 12112(a). Unlawful discrimination under the ADA includes both the failure to provide reasonable accommodation and discriminatory discharge on account of disability. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). Mathias alleges that she was the victim of both. But "[n]o matter the type of

discrimination alleged—either disparate treatment or failure to provide a reasonable accommodation—a plaintiff must establish first that she was 'a qualified individual with a disability.'" *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997). The parties do not dispute that Mathias was a qualified individual; they do, however, quibble over whether her ankle injury constitutes a disability.

### 1.  Disability under the ADA

Dollar General asserts Mathias has not adequately alleged that she was "disabled" under the ADA, and therefore, she cannot maintain either her disparate treatment or failure to accommodate claims. *Cassimy v. Bd. of Educ. of Rockford Pub. Sch., Dist. No. 205*, 461 F.3d 932, 935–36 (7th Cir. 2006) (if plaintiff is not disabled, "then neither his discrimination claim nor his failure to accommodate claim can proceed, as this is the first element of both claims."). The ADA defines "disability" as "(A) a physical or **mental impairment** that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Mathias claims that she suffers from an actual impairment and, even if she didn't, Dollar General perceived her as disabled under 42 U.S.C. § 12102(1)(A) and (C).

Mathias' designated evidence reveals that Mathias reported to Dr. Roper in September 2018 with severe symptoms. (ECF No. 44-1: "The symptoms occur constantly with intermittent worsening…Currently the patient states that the symptoms are severe. The pain is described as throbbing. The symptoms occur continuously."). He diagnosed her with "severe ankle arthritis, right, post-traumatic" aggravated by "standing, walking, weather changes, and work activities" (ECF No. 44-1). Dollar General, however, focuses on Mathias' testimony that her disability only affects "continuous fast-paced walking" and argues that this is not a major life activity. It also

argues that Mathias' ankle impairment "merely caused Plaintiff to slow the pace of her work, but it did not substantially limit her ability to work." (ECF No. 39 at 13).

Having reviewed Mathias' evidentiary submissions and the expansive coverage of the ADA, the Court determines that Mathias has raised a genuine issue of material fact as to whether her severe ankle arthritis substantially limits her in a major life activity. The ADA explicitly directs that "disability" shall be "construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A). The statute defines "major life activities" to include "walking," "standing," and "working." 42 U.S.C. § 12102(2)(A); *see also* 29 C.F.R. § 1620.2(i)(1)(i) (including additional activities of sitting, reaching, and interacting with others). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 889 (7th Cir. 2019) (*quoting* 29 C.F.R. § 1630.2(j)(1)(ii)); *see also id.* § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard."). "The question is whether a plaintiff is limited 'as compared to most people in the general population.'" *Bob-Maunuel v. Chipotle Mexican Grill, Inc.*, 10 F. Supp. 3d 854, 881 (N.D. Ill. Jan. 15, 2014) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).

Mathias described her duties in Repack as "a lot of hustle and bustle. They're – they're on you to get everything done by a certain time, and you have certain time limits to get your books done, so you are walking fast-paced for a long period of time trying to go around others, trying to work around getting the products, going around the mod, around the conveyor belt." (Mathias Dep. at 89). Dollar General downplays these requirements noting that infrequent "flare-ups" or intermittent pain is not enough to establish a disability as it is not substantially limiting. *See Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 952 (7th Cir. 2000) (holding that infrequent "flare-ups"

of plaintiff's rheumatoid arthritis, occurring one or two times a year, did not equate to a "disability" under the ADA). But here, Mathias has presented evidence showing that from at least September 2019 through December 2019, the infrequent pain she had from her accident became more persistent, potentially required surgery, and caused mobility issues (it slowed her ability to walk). The Court can reasonably infer that her persistent pain could substantially limit her ability to stand, walk, and work in a warehouse setting, especially given the job requirements she described. All this notwithstanding, even if the Court presumes Mathias is disabled, she has other more pressing problems that preclude her ADA claims.

### 2. Disparate Treatment/Discrimination

To establish an ADA disparate treatment claim, a plaintiff must prove that: (1) she is disabled under the ADA; (2) she is qualified to perform the essential functions of the job, either with or without reasonable accommodation; and (3) her disability was the "but for" cause of the adverse employment action. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020). As explained above, Dollar General challenges whether Mathias meets the first prong, but at this stage, the Court gives her the benefit of the doubt that she is disabled under the ADA. This leaves Dollar General's remaining argument: that she fails to raise an issue of fact that "but for" her disability she would not have been terminated.

To show that disability discrimination was the "but for" reason for the termination, a plaintiff can use either direct or circumstantial evidence. Direct evidence would be an admission that the defendant fired the plaintiff on the basis of her disability. Circumstantial evidence may include (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside the protected group systematically receive better treatment; and (4) evidence that the employer

16

offered a pretextual reason for an adverse employment action. *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). A plaintiff may, but need not, utilize the familiar *McDonnell-Douglas* burden shifting framework to organize her evidence.[12] Regardless of methodology, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also Liu v. Cook Cnty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Mathias has not alleged that there is direct evidence of discrimination; she has not alleged that the defendant has admitted to discrimination, nor has she alleged the existence of "smoking gun" evidence. That means that she must use circumstantial evidence to prove her disparate treatment claim. Neither party strictly adopts the *McDonnell Douglas* approach although they discuss its various elements in their respective analyses. Dollar General focuses on the one factor of the prima facie case it believes is determinative: whether Mathias has shown that similarly situated employees who were not disabled received better treatment than she did.

The similarly situated inquiry is flexible, common-sense, and factual. It asks "essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir.2007). There must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow

---

[12] Under the indirect method of proof, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she is disabled under the ADA; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *Lloyd v. Swifty Transp., Inc.,* 552 F.3d 594, 601 (7th Cir. 2009).

the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id*. In other words, the proposed comparator must be similar enough to permit a reasonable juror to infer, considering all the circumstances, that an impermissible animus motivated the employer's decision. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).

Mathias asserts that Quick and Ferdin are similarly situated to her in that they both engaged in comparable conduct by climbing on equipment but Dollar General only terminated one of them. This inconsistent handling of similar alleged safety violations, she believes, shows Dollar General's discriminatory intent. She also disputes that she committed the safety violation despite her admission in a written statement that she did so:

> Q.   Can you tell me what they claimed you did and then – you know, what they claimed you were fired for, and then tell me why you disagree with it.
> A.   Two different people claimed that I climbed racks…in mod 12. One is claiming I climbed it on the front, one is claiming that I climbed it on the back. I cannot physically climb the racks with my brace and my knee.
> Q.   Okay. So you're saying you never climbed on the racks at all?
> A.   No. I stepped up on the bottom ledge which is four inches off the ground. It's shorter than the steps we take to go up to the mod. Is it physically climbing? No. I only stepped on the bottom ledge.
> Q.   Okay. And do you not think that that's a safety violation?
> A.   It's shorter than a step. How – how would that be a safety violation? We have never been told not to step on the bottom rack.

(Mathias Dep. at 212).

Dollar General disagrees that Ferdin is a proper comparator or that it matters whether Mathias now disputes whether she engaged in the safety violation. All that matters, Dollar General contends, is whether at the time of the employment decision, Dollar General reasonably believed she engaged in a safety violation. Because the Court agrees that Plaintiff has not produced evidence that similarly situated others were treated differently, the Court need not address whether Dollar General's reason for terminating her was the real reason or a pretextual one. *See Fisher v. Wayne*

18

*Dalton Corp.*, 139 F.3d 1137, 1142 (7th Cir. 1998) ("Fisher fails to raise a genuine issue of material fact that he could satisfy the prima facie case requirement that a similarly situated employee received more favorable treatment.... This court need not proceed any further in the *McDonnell Douglas* analysis once we determine that a claimant has failed to make a prima facie case." (citations omitted)).

Turning to Mathias' evidence of alleged comparators, the undisputed record is that Ferdin committed similar conduct to that of Mathias but received only a "coaching" document from her supervisor, Moreland. It is also undisputed that Daugherty, who terminated both Quick and Mathias for safety violations, was unaware that Ferdin had violated safety protocols and received only a written warning. She testified that had she known Ferdin had not been terminated, she would have overruled Moreland and recommended Ferdin's termination. (Daugherty Dep. at 144-148). This evidence removes Ferdin from the category of relevant comparators since more lenient treatment by one supervisor is not evidence of another supervisor's discriminatory intent. *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826–27 (7th Cir. 2008) ("Different decisionmakers may rely on different factors when deciding whether, and how severely, to discipline an employee. So, to be similarly situated, [an employee] must have been treated more favorably by the same decisionmaker that fired the [plaintiff]."); *Smart v. Int'l Brotherhood of Elec. Workers*, 315 F.3d 721, 728 (7th Cir. 2002) (other employee's more favorable treatment not evidence of discrimination if the employer was unaware that other employee had engaged in same conduct as the plaintiff).

Realizing that this is problematic, Mathias asserts that Daugherty's testimony is self-serving. She points out that supervisors are required to turn in S.M.A.R.T. coaching documents to human resources and it is illogical to conclude that Daugherty would not have seen the document. But she lacks any evidence to dispute Daugherty's testimony. There is no evidence that Moreland

turned in the S.M.A.R.T. coaching document to human resources, no evidence Daugherty reviewed the document, and no testimonial evidence that Moreland consulted Daugherty before imposing the discipline on Ferdin. Without such evidence to raise a question of fact, Mathias cannot show Ferdin is a proper comparator.

This leaves Mathias with only one comparator – Quick – who received identical treatment as Mathias for a similar safety violation. Thus, she has not supported an inference that she was treated differently than similarly situated employees without a disability. Summary judgment is GRANTED as to Mathias' ADA disparate treatment claim.

### 3. *Failure to Accommodate*

Mathias contends that Dollar General failed to accommodate her when it did not approve her to wear a walking boot until Matrix received Dr. Roper's letter requesting Mathias be able to wear a boot. As part of this argument, she contends that Daugherty failed to engage in the interactive process with her when she asked to wear a walking boot.

"A claim for failure to accommodate under the ADA ... requires proof [that] (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of h[er] disability; and (3) defendant failed to accommodate h[er] disability reasonably." *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). "[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches." *Jovanovic v. In–Sink–Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). When an employee requests an accommodation, the employer must engage in a flexible, interactive process to identify a reasonable accommodation. *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (1996). Of course, "the failure to engage in the interactive process required by the ADA is not an independent basis for liability under the statute, and that failure is actionable only if it prevents identification of an appropriate

accommodation for a qualified individual." *Basden v. Professional Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013).

When Mathias left Dr. Roper's office on September 7, 2019, she was provided documentation releasing her to work without restrictions, which she provided to Dollar General. The evidentiary record reveals that Mathias spoke to Daugherty a few days after her September 7, 2019, appointment with Dr. Roper and asked if she could wear a walking boot. Daugherty told her that she could not do so and the conversation ceased. It is at this point that Mathias believes Daugherty erred by not engaging with her to determine what accommodation would be suitable to Dollar General. Even so, Mathias concedes that once Dr. Roper provided a letter to Matrix requesting that she be able to wear a boot, some ten or so days later, she could do so. The question then, is whether Dollar General was on notice of both Mathias' disability and the need for an accommodation sufficient to trigger the interactive process when Mathias spoke to Daugherty. The secondary question is whether in the approximately 10 days between Plaintiff's conversation with Daugherty and the request by Dr. Roper, Dollar General violated the ADA. Considering the purpose of the ADA and the parties' respective obligations, the Court finds that Dollar General did not violate the ADA in the ten days between Mathias' initial request to wear a walking boot and the date Matrix approved her accommodation request.

In the arena of claims such as this, the Court is "primarily concerned with the ends, not the means." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). Indeed, "[t]he ADA seeks to ensure that qualified individuals are accommodated in the workplace, not to punish employers who, despite their failure to engage in an interactive process, have made reasonable accommodations." *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000). Here, when she spoke with Daugherty, Mathias had been released to work three days earlier without

restrictions. While she asked to wear a walking boot and perhaps even suggested she was having pain walking, there is no evidence that Daugherty or Dollar General had any information putting it on notice of Mathias' need for an accommodation because of a disability. Moreover, even if Mathias' testimony is credited, Daugherty told her that it would be considered a "crutch" and violate safety protocols, presumably an undue burden for an employer. It was not until ten days later, when Dr. Roper submitted a letter connecting the walking boot to Mathias' disability and requesting she be allowed to wear *either* the walking boot or an elevated closed-toe boot that Dollar General was on notice. And, from that point onward, it accommodated Mathias. See *Ekstrand v. Sch. Dist. of Somerset,* 583 F.3d 972, 976 (7th Cir.2009) ("our cases have consistently held that disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor," before an employer must provide an accommodation). Given the purpose of the ADA, the Court cannot conclude that Dollar General violated the ADA when it waited until it received actual notice through medical documentation to provide Mathias with an accommodation. Summary judgment for Dollar General is GRANTED on Mathias' failure to accommodate claim.

### 4. *Retaliation*

For many of the same reasons Mathias' disparate treatment claim fails, so too does her contention that Dollar General terminated her in retaliation for exercising her ADA rights. For a retaliation claim under the ADA, Mathias must submit evidence that (1) [s]he engaged in protected activity, (2) h[er] employer took an adverse action against h[er], and (3) there was a " 'but for' causal connection between the two." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020). To prove causation, a plaintiff must prove more than protected activity occurred and later,

an adverse action occurred. Indeed, "just because the rooster crows doesn't mean he caused the sun to rise that same morning." *Broadway v. St. Joseph Reg'l Med. Ctr. - S. Bend Campus, Inc.*, 2022 WL 4598588, at *12 (N.D. Ind. Sept. 30, 2022). Thus, a plaintiff must point to direct evidence of a retaliatory motive or "circumstantial evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 379 (7th Cir. 2020). Regardless of which type of evidence is used, "[t]he 'dispositive question' is 'whether a reasonable [fact-finder] could find a but-for causal link between the protected activities and adverse actions at issue.'" *Id.* (quoting *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 697 (7th Cir. 2017)).

Here, the parties' dispute centers around the third element – causation – but Mathias has altogether failed to connect the dots between her protected activity under the ADA and her termination. She has not identified any direct evidence and her circumstantial evidence fails to pass go. Mathias first requested an accommodation on September 10, 2018, and was granted an accommodation ten days later. She was not terminated until April 22, 2019 – 7 months later. So she has no evidence of suspicious timing. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966-67 (7th Cir. 2012) (five week lapse too long to base a retaliation claim solely on suspicious timing because "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action"); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven-week interval too long to raise inference of retaliation); *Filipovic v. K & R Express Sys.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four months between protected activity and termination was "counter-evidence of any causal connection"). Nor, as the Court explained above, does she have any evidence of relevant

23

comparators treated differently. In essence then, all Mathias has demonstrated is that the rooster crowed one September morning and the sun came up seven months later. Without any other evidence, Mathias has not raised a genuine issue of fact that her termination was in retaliation for her ADA protected activity. Summary judgment is GRANTED on this claim.

### 5. *Hostile Work Environment Claim*

A plaintiff may claim a hostile work environment under the ADA. *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 852 (7th Cir. 2019). To succeed on this claim, a Plaintiff must show that (1) she was subject to unwelcome harassment; (2) the harassment was based on disability; (3) the harassment was severe or pervasive enough, both subjectively and objectively, to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022). In determining whether a workplace is objectively hostile, the Court considers the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993); *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). "Insults, personal animosity, and juvenile behavior are insufficient evidence of a hostile work environment unless they are so pervasive or severe as to interfere with an employee's work performance." *Brooks,* 39 F.4th at 441.

Dollar General seeks summary judgment on Mathias' hostile work environment claim asserting she fails to establish an objectively severe or pervasive working environment. The Court need not expend tremendous effort on this claim for even if the Court accepts all of Mathias' factual statements as true, her hostile work environment claim fails. No jury could reasonably

conclude from the evidence that Mathias' work environment was objectively offensive, or that the conduct was severe or pervasive.

No doubt Mathias believed her work environment was subjectively offensive, see *Alexander*, 739 F.3d at 982. Mathias testified that Leavitt used a boorish reference to a sexual act to describe why she was placed on a reduced schedule. She also recounts being overhearing coworkers call her a "gimp" or a "crip" a few times. These facts may help to show that Mathias' work environment was offensive to her, but it does not evince a triable issue of fact on the objectively hostile work environment element. Mathias cannot cite to any facts to demonstrate that her work environment was "permeated with discriminatory intimidation, ridicule, and insult…" let alone that it altered the conditions of her employment. At most these are rude and insensitive comments, and "general hostility and comments" are not sufficiently severe or pervasive. *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004); *Abrego*, 907 F.3d at 1015.[13] Mathias cannot prevail on her hostile work environment claim.

**B. FMLA Claims**

The FMLA requires employers to give eligible employees leave for serious health conditions that prevent them from performing their job functions. 29 U.S.C. § 2612(a)(1)(D); *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 908 (7th Cir. 2008). To safeguard these rights, the FMLA prohibits employers from (1) interfering with, restraining, or denying the exercise of FMLA rights and (2) discriminating or retaliating against employees for exercising FMLA rights. 29 U.S.C. §§ 2615(a)(1), (a)(2); *see Darst*, 512 F.3d at 908. The FMLA

---

[13]It is also worth noting that the duration of the harassing conduct was abbreviated – spanning approximately a week. Mathias went on a reduced schedule on December 13 and she wrote the letter to Daugherty identifying the harassment on December 20, 2018. Daugherty investigated her complaint and Mathias does not contend that the harassment continued after that investigation.

grants employees a right of action for both types of violations, 29 U.S.C. § 2617(a)(2), although each has a different legal standard. *Ziccarelli v. Dart*, 35 F.4th 1079, 1089-91 (7th Cir. 2022). Plaintiff asserts both types of claims here.

### 1. Interference

Turning to Mathias' claim of FMLA interference, there are five elements to establish her claim. *Ziccarelli*, 35 F.4th at 1084. "The first four elements require the plaintiff to show that: (1) the employee was eligible for FMLA protections; (2) the employer was covered by the FMLA; (3) the employee was entitled to leave under the FMLA; and (4) the employee provided sufficient notice of intent to take FMLA leave." *Id.* (renumbering and citing *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 363 (7th Cir. 2020) and *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015)). The parties dispute only the fifth prong—that Dollar General either denied FMLA rights or interfered with or restrained her FMLA benefits. *See Ziccarelli*, 35 F.4th at 1080-85 ("statutory text and context favor a reading that interference with, or restraint of FMLA rights can violate § 2615(a)(1), without proof of an actual denial"). Obtaining relief requires "prejudice"—that harm resulted from the violation. 29 U.S.C. § 2617(a); *Lutes*, 950 F.3d at 368 (citing *Ragsdale v. Wolverine World Wide*, Inc., 535 U.S. 81, 89 (2002)).

Mathias' argument is two-fold. First, she contends that Daugherty's failure to advise her about FMLA leave when she requested to wear a walking boot translates into interference with her FMLA rights. Second, she contends that Daugherty interfered with her FMLA rights when she delayed implementing the reduced schedule and responded to Matrix that Dollar General doesn't "accommodate reduced schedules" after Matrix' provided her notice that it had approved Mathias' request for a reduced schedule.

In requesting leave, employees need not expressly assert rights under the FMLA or even mention the FMLA but may only state that leave is needed and alert the employer that the employee has a serious medical condition. *See Burnett v. LFW Inc.*, 472 F.3d 471, 478 (7th Cir. 2006) ("An employee need not expressly mention the FMLA in his leave request or otherwise invoke any of its provisions"); *Stevenson v. Hyre Elec. Co.,* 505 F.3d 720, 725 (7th Cir. 2007) (employee must alert her employer to the "seriousness of the health condition."). For instance, calling in sick without providing additional information does not provide sufficient notice under the FMLA. 29 C.F.R. § 825.303(b); see also, *Burnett,* 472 F.3d at 479; *Collins v. NTN–Bower Corp.,* 272 F.3d 1006, 1008 (7th Cir. 2001) ("'Sick' does not imply 'a serious health condition.'"). This is true even if the employee provides her employer with a doctor's note if the note does not convey the seriousness of her medical condition. See *Phillips v. Quebecor World RAI, Inc.,* 450 F.3d 308, 311–12 (7th Cir. 2006). The FMLA's notice burden is not onerous but neither is it illusory. *de la Rama v. Illinois Dept. of Human Services,* 541 F.3d 681, 687 (7th Cir. 2008).

Looking at the facts Mathias presents, the Court cannot conclude that when she discussed the walking boot with Daugherty, she complied with the notice provisions of the FMLA and adequately communicated that she was seeking FMLA related leave. "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Satterfield v. Wal–Mart Stores, Inc*., 135 F.3d 973, 977 (5th Cir. 1998). The facts, read favorably to Mathias, show that she had visited the doctor and discussed whether wearing a walking boot would help her pain at work. That said, Dr. Roper ultimately wrote a note permitting her to return to work without restrictions. Nor does Mathias contend that she asked Daugherty for any time off work for her ankle injury during their conversation. Rather, her request was simply whether she could use an orthopedic boot on

the job. This request would not put a reasonable employer on notice that FMLA leave was being requested, might be helpful, or that her ankle-related injury was a serious health condition.[14] Dollar General cannot have interfered with that which it was unaware.

Next, Mathias contends that Daugherty's actions in not implementing her leave once Matrix approved it, interfered with her FMLA rights and required her to work four hours that should have been documented as FMLA leave time. On this score, the Court agrees with Mathias that an FMLA violation occurred. Matrix approved Mathias' leave on December 6 to begin immediately but Daugherty did not implement the reduced schedule for another seven days, causing Mathias to work 10-hour shifts on two days and sending her home on the third day. Dollar General excuses the implementation delay saying it was only "slight" and came about because Daugherty was first told that Mathias could work "40 hours max" and it was not until December 13, 2018, that Daugherty learned Mathias was limited to eight hours per shift. The problem with this rationale, however, is that even a slight delay can be an FMLA violation if there is prejudice to the employee. *Kinney v. Century Services Corp. II,* 2011 WL 3476569 (S.D. Ind. Aug. 9, 2011) (denying summary judgment where FMLA violation prejudiced plaintiff by requiring plaintiff to use one paid vacation day). Dollar General's delay in implementing Mathias' reduced schedule after it was approved constitutes an FMLA violation.

But that is not the end of the inquiry. Even where a plaintiff is shows a technical FMLA violation, "a claim for interference will fail unless the employee also shows that the employer's interference prejudiced the employee as the result of a real, remediable impairment of her rights

---

[14] Even if Plaintiff asserts that she advised Dollar General in her interview of her serious health condition, the Court does not agree that this put them on notice that she would require leave because of it. In her interview, Plaintiff disclosed her prior injury but said that she had experienced no issues in the months before applying for employment and she did not request any sort of accommodation or schedule restrictions from Dollar General.

under the FMLA." *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.,* 826 F.3d 1149, 1160 (8th Cir. 2016) (citing *Ragsdale*, 535 U.S. at 89–90). Indeed, the FMLA does not entitle an employee to relief unless the employee was prejudiced by the violation. 29 C.F.R. 825.301(e). Rather, for an employee to recover under the statute, she must have suffered actual harm. *Harrell v. United States Postal Serv.,* 44 F.3d 913 (7th Cir. 2006).

On this score, Plaintiff is out of luck. She has produced no evidence of actual harm to her for the four hours she worked that should have been credited as FMLA leave. She was not docked FMLA hours during this time (because she worked them), she has made no assertion that her condition worsened due to those four hours, nor has she asserted any other harm that resulted from these few hours she worked. Because she has not raised a genuine issue of fact that Dollar General's FMLA violation prejudiced her, Dollar General is entitled to summary judgment on Mathias' FMLA interference claim.

### 2. *FMLA Retaliation*

Next, Mathias asserts that Dollar General retaliated against her for exercising her rights under the FMLA. As was the case with her ADA retaliation claim, to succeed on a retaliation claim, a plaintiff must prove that "(1) [s]he engaged in statutorily protected activity; (2) the employer took adverse action against [her]; and (3) the protected activity caused the adverse action." *Id.* That said, unlike her ADA retaliation claim, which requires "but for" causation, *Kotaska*, 966 F.3d at 632,[15] to prevail under the FMLA, Mathias need not prove that "retaliation

---

[15]The Seventh Circuit holds that while the ADA and FMLA are "legally distinct," in cases claiming unlawful retaliation, the analyses overlap. *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 900 (7th Cir. 2018). Thus, in *Freelain,* the Seventh Circuit articulated that to succeed on a retaliation claim under either statute, a plaintiff must prove that "(1) [s]he engaged in statutorily protected activity; (2) the employer took adverse action against [her]; *and (3) the protected activity caused the adverse action." Id.* (emphasis added). Although the third element (causation) is a required element for a retaliation claim under either statute, the district courts have expressed some confusion as to the proper causation standard applicable in retaliation claims when a plaintiff alleges retaliation under both statutes. *See Durns v. Fam. Guidance Centers*, 2021

was the *only* reason for her termination; she may establish a retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Anderson v. Nations Lending Corp.,* 27 F.4th 1300, 1307–08 (7th Cir. 2022) (quoting *Lewis v. Sch. Dist. #70,* 523 F.3d 730, 741–42 (7th Cir. 2008)). While these differing standards may, at first glance, be a nuanced distinction, in this case the distinction makes all the difference when considering Plaintiff's evidentiary submissions, as will be evident below.

There is no question that Mathias engaged in statutorily protected activity by using FMLA leave. And she experienced an adverse action when she was terminated from her position. The only question is whether there is a connection between the two. "Therefore, we need only determine whether the record established by [Mathias] supports the inference that [she] established a causal connection between the two events." *See Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 633 (7th Cir. 2009). And, as set forth in the discussion above, that causal connection inference need only be whether the evidence demonstrates that her FMLA protected conduct was "a substantial or motivating factor" in the decision to terminate her. By a slim margin, Plaintiff has established such an inference.

"A retaliation claim requires proof of discriminatory or retaliatory intent, which can be established directly or indirectly." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir.

---

WL 4477919, at *7 (N.D. Ill. Sept. 29, 2021) ("as this court reads the caselaw, a claim of FMLA retaliation requires only that "the protected conduct was a substantial or motivating factor in the employer's decision," while an ADA retaliation claim requires a showing of but-for causation."); *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (quoting *Lewis v. Sch. Dist. # 70,* 523 F.3d 730, 741–42 (7th Cir. 2008)) (FMLA retaliation); *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (ADA retaliation).) This Court agrees that the Seventh Circuit holds a "but-for" causation standard is required in ADA cases, *Kotaska*, 966 F.3d at 632, while the FMLA requires only a showing that the protected conduct was a substantial or motivating factor in the employer's decision. *Anderson*, 27 F.4th at 1307–08. For this reason, the Court analyzes the claims under their respective standards articulated by the Seventh Circuit.

2012) (citing *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)). Mathias has no direct evidence of Dollar General's intent, thus she points to circumstantial evidence she contends, when read holistically, raises an inference of that discriminatory intent. For instance, Mathias points to Daugherty's outright denial of her request to wear a boot to show that Daugherty harbored an animus towards her. This animus, she argues, was further stoked when Mathias requested FMLA leave and this animus was evidenced by Daugherty's email disputing Mathias' entitlement to FMLA leave. These facts alone, while certainly problematic for Dollar General, don't get the job done for Mathias.

Perhaps the strongest piece of evidence is Mathias' testimony that the day before she was accused of climbing on racks, Daugherty made the cryptic comment that "she" requested FMLA "again" followed by the statement that "she" would be gone before it was approved. This statement, assuming it was in reference to Mathias, was made within two weeks of Mathias' April 4 recertification request for intermittent leave, which had not yet been approved by Matrix when Daugherty made the alleged statement. Mathias also relies on evidence that Daugherty specifically inquired into whether Mathias had enough attendance points to be terminated. And this activity came after Daugherty delayed implementing her approved reduced schedule. Finally, Mathias points to the discrepancy in how her FMLA leave time was reported and the fact that she believes Daugherty was padding the amount of leave she was taking to run her out of FMLA time sooner.

Dollar General tries to drift the Court away from these facts contending that there is no evidence that the "she" that Daugherty was referring to was Mathias. Additionally, they reiterate that Mathias admitted the safety violation which, they contend, shows that they had a legitimate reason to terminate her. But neither of these facts, which are disputed, are sufficient to sway the Court's determination that a jury needs to sort this out.

It is unclear in the record whether Daugherty denies that she made the comment Mathias alleges she overheard at all. But assuming she does, on summary judgment the Court must credit Mathias with reasonable inferences that can be drawn from her own testimony. S*ee Ziccarelli,* 35 F.4th at 1079, fn 2 ("We emphasize, however, that because the defendants chose to move for summary judgment, we must discount [their FMLA manager's] testimony and credit plaintiff's on these disputed factual issues."). In addition to evidencing bias, Daugherty's alleged remarks were both proximate and directly linked to the firing decision – they occurred the day before the alleged safety violation (which Mathias now disputes). *See Castetter*, 953 F.3d at 997 ("[I]solated comments must be contemporaneous with termination or causally related to the" adverse action.); *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1072 (7th Cir. 2012) (internal citation omitted) ("A remark can raise an inference of discrimination when it was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action."). And, to the extent Dollar General attempts to isolate itself by claiming there is no evidence that Matrix informed Daugherty about the April 4 FMLA request, Daugherty's alleged statement, if believed by the jury to be about Mathias, is evidence of Daugherty's knowledge of Mathias' protected activity. *See Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022) ("Knowledge of the protected activity [by the relevant superiors] is necessary to show causation for a retaliation claim.").

"At summary judgment, ... saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact." *United States v. 5443 Suffield Terrace, Skokie*, 607 F.3d 504, 510 (7th Cir. 2010). Based on the record here, Mathias has produced evidence raising an inference of causation. As the decisionmaker in this instance, Daugherty's credibility is front and center. It is up to the

jury to determine whether she made the statement Mathias alleges she overheard and, if so, whether the statement concerned Mathias. It is also up to the jury to assess whether the safety violation was, as Mathias claims, a "cover" for unlawful retaliation because she continued to request FMLA leave, or whether it was the sole factor in the decision to terminate her. Either way, these questions cannot be resolved at summary judgment. For now, when taken together with all the other circumstantial evidence Mathias presents, Mathias has raised the required inference that her protected activity was a substantial or motivating factor in her termination. Summary judgment is DENIED as to Plaintiff's FMLA retaliation claim.

<u>**CONCLUSION**</u>

Based on the reasoning above, Dollar General's Motion for Summary Judgment (ECF No. 38) is DENIED as to Plaintiff's FMLA retaliation claim. The Motion is GRANTED in all other respects. The Motion to Strike the Declaration of Donald Mathias (ECF No. 46) is DENIED as MOOT. A telephonic status and scheduling conference to set the matter for trial will be set by separate entry. The parties should be prepared to discuss the status of settlement discussions, including whether mediation has been scheduled or conducted at that conference.

SO ORDERED on October 28, 2022.

s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT